# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **LARRY A. ODOM, SR.,** *et al.*, ) | |
| ) | |
| Plaintiffs / Counter-Defendants, ) | |
| ) | |
| v. ) | **CIVIL ACTION 09-0147-WS-N** |
| ) | |
| **SOUTHEAST SUPPLY HEADER, LLC,** ) | |
| ) | |
| Defendant / Counter-Plaintiff. ) | |

## ORDER

This matter comes before the Court on plaintiffs' Motion for Summary Judgment (doc. 77) as to the abuse of process counterclaim, and on defendant's Motion for Partial Summary Judgment (doc. 80) as to plaintiffs' fraud claim relating to the non-restoration of their property. Both Motions have been briefed and are ripe for disposition.[1]

**I.     Background and Procedural Posture.**

In their Complaint (doc. 1), plaintiffs, Larry and Judy Odom, brought claims against defendant, Southeast Supply Header, LLC ("SESH"), arising from a Grant of Easement pursuant to which the Odoms had authorized SESH to install a natural gas pipeline some eight feet below the surface of their property, as part of a 269-mile pipeline running from northeastern Louisiana to Mobile County. Plaintiffs' principal theory of recovery, as articulated in causes of action for fraud, continuing trespass, nuisance, and inverse condemnation, was that SESH had harmed the Odoms by installing the pipeline in the wrong location, such that it had exceeded the boundaries of the Grant of Easement and had effectively taken plaintiffs' property. As this Court has observed, "the gravamen of the wrong about which the Odoms are complaining is that SESH has created a swath of land on their property that the Odoms cannot use because it is trapped between two easements that were supposed to be contiguous." (Doc. 62, at 1.)[2] Rather than

---

[1]     Also pending is defendant's filing styled "Motion to Dismiss Plaintiffs' Remaining Claim as Sanction for Failing to Make Pretrial Disclosures" (doc. 67).

[2]     Plaintiffs echoed this assessment by indicating that the "thrust" of their Complaint is "that the easement described is not descriptive of the actual location of the easement resulting

abutting the pre-existing easement (known as the "Gateway Easement"), like everyone intended, the SESH Easement was ultimately positioned in a location where there was small gap between the two easements, forming a sliver of "no man's land" on the Odoms' property.

SESH brought a Counterclaim (doc. 9) interposing three claims against the Odoms. SESH's first claim sounded in declaratory judgment and sought a declaration that SESH had installed the pipeline in a location that complied with the easement agreement. In its second counterclaim, SESH requested judicial reformation of the easement agreement under Alabama law to conform the written instrument to the parties' intent. Third, SESH brought a claim for abuse of process against plaintiff Larry Odom, Sr. ("Mr. Odom"), alleging that his actions, "including his continued prosecution of this lawsuit, are and have been intended to cause needless expense and harassment to SESH and further Mr. Odom's original threat." (Doc. 9, ¶ 23.) This "original threat" was described in the Counterclaim as an incident in which "Mr. Odom informed a SESH representative that if SESH persisted in its plan to install the pipeline he would continually make things difficult for SESH to the very end of the SESH project." (*Id.*, ¶ 17.) SESH maintains that Mr. Odom brought and pursued this litigation to fulfill that objective, as evidenced by his rejection of numerous offers by SESH to amend the easement agreement to eliminate the strip of "no man's land" without expanding the width of SESH's easement, a solution which would have eradicated the harm of which the Odom complain in this lawsuit. (*Id.*, ¶ 21.)

At the close of discovery, SESH moved for summary judgment on Count One, or in the alternative Count Two, of the Counterclaim, as well as all the Odoms' causes of action. Via Order (doc. 62) entered on December 9, 2009, the undersigned granted the motion in part, and denied it in part. The most salient aspect of the December 9 Order was that it reformed the easement instrument, pursuant to Alabama Code § 35-4-153, on grounds of mutual mistake. The December 9 Order recognized that Alabama law authorizes reformation of a contract because of mutual mistake "when the parties have entered into an agreement, but the deed does not express what the parties intended under the agreement." *Fadalla v. Fadalla*, 929 So.2d 429, 434 (Ala. 2005). On the summary judgment record, the Court found that mutual mistake existed and that

---

in loss of use of land for the Plaintiffs without compensation." (Doc. 68, ¶ 2.)

reformation was appropriate, reasoning as follows:

> "Both SESH and the Odoms intended at the time of the Easement's creation that SESH's right-of-way would be contiguous to the southern boundary of the Gateway Easement across the length of the Odoms' property, with no gaps or spaces between the two easements. That's what both sides intended, yet their written instrument diverged from that intent because it defined the SESH right-of-way as the 25-foot strip on each side of the centerline of the new pipe, rather than as the 50-foot strip immediately abutting the Gateway Easement. ... Everyone wanted the SESH right-of-way to be placed right up next to the Gateway Easement, but the Easement document itself was drafted in such a way that a strip of 'no man's land' between the two easements was created when the SESH pipeline was installed more than 25 feet away from the boundary line of the Gateway Easement."

*Odom v. Southeast Supply Header, LLC*, 675 F. Supp.2d 1105, 1118 (S.D. Ala. 2009).[3]

On that basis, the Court reformed the easement instrument "to provide that the right-of-way granted to SESH is defined as the 50-foot strip of land immediately adjacent to the southern boundary line of the Gateway Easement, irrespective of the exact location of the pipeline within that strip." *Id.* at 1121. The gap about which the Odoms claimed to be aggrieved having thus been eradicated, the December 9 Order granted summary judgment to SESH on most of plaintiffs' claims and on Count Two of the counterclaim.[4] Consequently, the only remaining causes of action are the following: (a) Count Three of SESH's counterclaim, which sounds in abuse of process against Mr. Odom; and (b) the portion of plaintiffs' misrepresentation claim in which plaintiffs accuse SESH of fraudulently inducing them to execute the easement instrument by promising to restore the right-of-way after installation, even though they never intended to do

---

[3] In a later ruling, the undersigned recapitulated the circumstances justifying reformation of the easement instrument in this case in the following terms: "[T]he relevant mistake was the drafting of the easement to define the right-of-way's boundaries by reference to the centerline of the pipeline (even though the pipeline's exact location was immaterial to all concerned), rather than by reference to the boundary of the Gateway easement (which was of critical importance to all concerned)." (Doc. 73, at 3 n.2.)

[4] Plaintiffs' ensuing attempt to extend the deadline for filing a Rule 59(e) motion to alter, amend or vacate the December 9 Order was denied pursuant to Rule 6(b)(2), Fed.R.Civ.P. (Doc. 66, at 1-2.) Plaintiffs' request for certification of interlocutory appeal of the December 9 Order pursuant to 28 U.S.C. § 1292(b) was denied as failing to meet the stringent statutory requirements. (Doc. 73, at 4.)

so. Because neither side had moved for summary judgment on these claims, the December 9 Order did not address their merits. At the Final Pretrial Conference held on January 19, 2010, however, it became apparent that the ends of justice and efficiency may be promoted by allowing the parties to submit supplemental summary judgment motions concerning those two outstanding causes of action, rather than simply proceeding to trial. The parties having now filed and briefed such motions, the sufficiency of the record evidence to create genuine issues of material fact on the abuse of process and non-restoration fraud causes of action is properly before the Court.

## II.     Summary Judgment Motion as to Abuse of Process Counterclaim.

### A.     *Relevant Facts.*[5]

As factual support for their Motion for Summary Judgment on the abuse of process cause of action, plaintiffs rely almost exclusively on excerpts from the deposition of Todd Flatt.[6] It appears that Flatt was an agent involved with the right-of-way acquisition process for the Odoms' property. (Flatt Dep., at 6, 14.) For a period of time, Flatt was SESH's "contact person" who dealt with the Odoms concerning the pipeline. (*Id.* at 34.) Flatt testified that when there was a problem of "rutting" in the right-of-way area, he met with the Odoms, resolved their concerns amicably, and "didn't have a problem at all" with them. (*Id.* at 15-16.) Flatt also

---

[5] As to both sides' competing motions for summary judgment, the Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, with respect to each side's motion for partial summary judgment, the non-movant's evidence is taken as true and all justifiable inferences are drawn in his, her or its favor.

[6] Two points bear mention from the outset. First, although the pleadings reflect that SESH's abuse of process counterclaim is leveled solely against Mr. Odom, the summary judgment motion is brought by both plaintiffs. Accordingly, the Court will refer to the motion and arguments as having been made by the Odoms collectively, even though only Mr. Odom is properly labeled a counter-defendant. Second, plaintiffs have hampered this Court's review of their summary judgment materials by citing to large clusters of excerpted deposition pages for each fact, rather than offering citations to the specific location in the Flatt transcript that they contend supports a particular factual proposition. The result of plaintiffs' failure to furnish pinpoint cites is that the Court is left guessing as to the import of particular pages of the lengthy deposition excerpts, and has been unable to isolate any portion of the record bolstering certain factual propositions set forth in plaintiffs' memorandum.

indicated that Mr. Odom had called him on at least two occasions to complain that stakes on his property showed the pipeline not being installed in the correct location. (*Id.* at 18-20.)[7] According to the deposition excerpts supplied by plaintiffs, Mr. Odom told Flatt that SESH "would have to get our checkbook out on this one," and cautioned Flatt "not to come back with a foolish offer." (*Id.* at 20.) Ultimately, Mr. Odom announced to Flatt that he "won't accept the difference between the pipelines." (*Id.* at 30.) That said, Flatt also indicated that he had "never had an unpleasant conversation with Mr. and Mrs. Odom," although the Odoms' son became "snappy" with him one day because the son "wasn't happy with how the situation was going." (*Id.* at 26.) Later, the Odoms' son warned Flatt that "he was going to give us one more chance to do the right thing before he turns the dogs lo[o]se." (*Id.* at 31.)

In sum, Flatt testified that he "never had any problems with Mr. and Mrs. Odom" and that they were "[a]bsolutely" courteous to him at all times. (*Id.* at 50, 80.) However, Flatt's testimony was clear that he wasn't the only SESH representative/agent to have dealings with the Odoms about the pipeline, inasmuch as there were frequent occasions when Flatt was out of town and others (including Bo Vires) handled those contacts with the Odoms. (*Id.* at 18-19, 46-47.) The record shows that other SESH agents had a decidedly less cordial experience in their dealings with Mr. Odom. Vires testified that on one occasion when he went to Mr. Odom's property to meet with him, Mr. Odom refused to shake Vires' hand, and instead exclaimed, "I'm gonna make you son-of-a-bitch's [*sic*] life a living hell." (Vires Dep., at 12-13.) Other SESH agents reported similarly acrimonious interactions with Mr. Odom, none of which plaintiffs have

---

[7] Incidentally, the portions of Flatt's deposition transcript submitted by the Odoms reinforce this Court's prior decision to reform the easement instrument on grounds of mistake. Flatt testified that trying to position the pipeline so that the centerline was exactly 25 feet from the edge of the Gateway Easement was a quixotic endeavor, as he opined, "I don't see how you could perfectly lay that pipeline right exactly on 25 and 25. It's got to get off here and there some. But I think the moving of the 50-foot right-of-way back to parallel those property lines is something that's done, and my understanding is we could do that here ...." (*Id.* at 38.) This testimony (on which plaintiffs rely) underscores the existence of a mutual mistake in the Grant of Easement which frustrated the parties' joint intent to have the two easements abut each other.

controverted.[8]

Also germane to the abuse of process claim is undisputed evidence that SESH repeatedly offered to redraft the agreement to eliminate the "gap" between the SESH easement and the Gateway easement that forms the basis of this lawsuit. In particular, George Thomas Bartolazzi, an Engineering and Construction Right-of-Way Manager for SESH, states that he was the "principal person" at SESH responding to the Odoms' complaints, which he says were "always" focused on "the perceived existence of the gap." (Doc. 88, Att. 1, at ¶¶ 2-3.) Bartolazzi avers that SESH periodically conveyed offers to the Odoms, both before and after this action was filed, to amend the easement to "completely eliminate the perceived gap and extra strips" at no expense or detriment to the Odoms. (*Id.* at ¶ 4 & Exhs. A, B.)[9] According to Bartolazzi, "the Odoms have consistently refused to allow SESH to eliminate the gap unless they were paid substantial money." (*Id.*) As of December 31, 2009, SESH had incurred just over $100,000 in attorney and expert fees and expenses in defending against this lawsuit, which fees and expenses would not have been incurred "if the Odoms had accepted SESH's offer to eliminate the gap." (*Id.* at ¶ 6.) These facts lie at the core of SESH's abuse of process cause of action.

---

[8] For example, SESH records show that on March 20, 2007, well before the easement instrument had been negotiated and finalized, Mr. Odom told a SESH agent that "if we are going to shove a pipeline down his throat he would not make it easy." (Doc. 88, Att. 1, Exh. C.) Less than two months later, on May 5, 2007, a SESH agent reported that Mr. Odom "said the sorry pipeline people can go to hell" and conveyed that he was "very hostile about the pipeline." (*Id.*)

[9] For example, in a letter dated February 23, 2009, nearly a month before the inception of this lawsuit, SESH's counsel notified the Odoms' counsel that plaintiffs' concerns about the placement of the pipeline "can easily be remedied by the execution of an agreement formally describing the SESH 50-foot easement by metes and bounds lying immediately adjacent to the existing easement. We repeat our willingness to execute such an amendment." (Doc. 88, Att. 1, at Exh. A.) In a follow-up letter dated November 6, 2009, prior to the initial summary judgment ruling by this Court, SESH reiterated its offer "to execute an amendment to the easement agreement that would specify that the easement was a strip 50 feet in width lying immediately adjacent to the Gateway easement. The pipeline would not be precisely in the center of that 50-foot strip, but this simply makes no practical difference." (*Id.* at Exh. B.) Yet plaintiffs rebuffed both the February 23 and the November 6 offers by SESH to amend the easement to eliminate the "no man's land" that underlies the Odoms' claims in this lawsuit.

B.   *Discussion.*

1.   *Elements of Abuse of Process Claim under Alabama Law.*

Under Alabama law, an abuse of process claim requires substantial evidence of "(1) the existence of an ulterior purpose; (2) a wrongful use of process, and (3) malice." *Hollander v. Nichols*, 19 So.3d 184, 193 (Ala. 2009) (citations omitted); *see also Preskitt v. Lyons*, 865 So.2d 424, 430 (Ala. 2003) ("This Court has held that in order to prove the tort of abuse of process, a plaintiff must prove: (1) the existence of an ulterior purpose; 2) a wrongful use of process, and 3) malice.") (citations and internal quotation marks omitted). Although the Alabama Supreme Court has not expressly said as much, it is well settled that the tort of abuse of process is disfavored because of its chilling effect on the exercise of one's right of access to courts.[10]

For liability to attach on an abuse-of-process theory, a plaintiff must show that "the suit is brought, not to recover on the cause of action stated in the complaint, but for a collateral purpose." *Haynes v. Coleman*, --- So.3d ----, 2009 WL 962523, *5 (Ala.Civ.App. Apr. 10, 2009) (citations omitted) (stating as examples of abuse of process circumstances where a creditor garnishes a debtor's exempt wages solely to coerce the debtor to pay the entire debt, or where a defendant prosecutes a plaintiff without reasonable ground to believe him guilty in order to extort payment of a debt). This improper purpose "usually takes the form of coercion to obtain a collateral advantage .... There is, in other words, a form of extortion ...." *Hollander*, 19 So.3d at 194 (citations omitted). The Alabama Supreme Court has explained that the kinds of activities which support an abuse of process claim include "[e]ntering up judgment and suing out

---

[10] *See, e.g., Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1265 (10th Cir. 2003) ("abuse of process is a narrow tort applying only to one who uses a legal process ... against another primarily to accomplish a purpose for which it is not designed") (citations and internal quotation marks omitted); *United States v. Pendergraft*, 297 F.3d 1198, 1206 (11th Cir. 2002) (noting that "tort actions for malicious prosecution and abuse of process ... are heavily disfavored because they discourage the resort to courts"); *Schmit v. Klumpyan*, 663 N.W.2d 331, 336 (Wis.App. 2003) ("Because of its potential chilling effect on the right of access to the courts, the tort of abuse of process is disfavored and must be narrowly construed to insure the individual a fair opportunity to present his or her claim."); *Butera v. Boucher*, 798 A.2d 340, 354 (R.I. 2002) ("this Court has viewed abuse-of-process actions with disfavor because they tend to deter the prosecution of crimes and/or to chill free access to the courts") (citations and internal quotation marks omitted); *see generally Delchamps, Inc. v. Bryant*, 738 So.2d 824, 832 (Ala. 1999) (malicious prosecution actions are disfavored in the law).

execution after the demand is satisfied; suing out attachment for an amount greatly in excess of the debt; causing an arrest for more than is due; levying an execution for an excessive amount; [and] causing an arrest when the party cannot procure bail, and keeping him imprisoned until, by stress thereof, he is compelled to surrender property to which the other is not entitled." *Preskitt*, 865 So.2d at 430-31 (citations omitted).

With regard to the "wrongful use of process" element, Alabama courts require a showing that the defendant's conduct "culminate[d] in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect." *Hollander*, 19 So.3d at 193 (citations omitted). "There is no liability where the defendant has done nothing other than carry out the process to its authorized conclusion, even though with bad intentions;" rather, abuse of process lies only where the defendant "somehow acted outside the boundaries of legitimate procedure after the charge had been filed." *Willis v. Parker*, 814 So.2d 857, 865 (Ala. 2001) (citations and emphasis omitted). "If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse." *Hollander*, 19 So.3d at 194 (citations omitted). Simply put, a claim for "abuse of process will not lie [where] no result was obtained that is unlawful or improperly attainable under the law." *Moon v. Pillion*, 2 So.3d 842, 847 (Ala. 2008) (affirming dismissal of abuse of process claim alleging that defendant had accused plaintiff of theft in an attempt to resolve a boundary dispute, but plaintiff had been found not guilty and criminal prosecution had no effect on settlement of boundary dispute); *see also Willis*, 814 So.2d at 866 (no abuse of process where defendant filed eviction action, albeit with bad motive, for purpose of obtaining direct result of eviction of tenant, which was an authorized and intended result under the law); *D.D. v. C.L.D.*, 600 So.2d 219, 221 (Ala. 1992) (abuse of process "is the malicious perversion of a regularly issued process to accomplish a purpose whereby a result not lawfully or properly obtainable under it is secured").

### 2. *The "Wrongful Use of Process" Element is Not Satisfied.*

In their Motion for Summary Judgment, plaintiffs devote considerable effort to demonstrating that their claims against SESH were viable in their inception, such that they were properly brought. But this line of analysis misses the mark. Alabama courts differentiate between abuse of process claims and malicious prosecution claims as follows: "[T]he tort of abuse of process is concerned with the wrongful use of process after it has been issued, while the

tort of malicious prosecution is concerned with the wrongful issuance of process." *Haynes*, 2009 WL 962523, at *5 (citations and internal quotation marks omitted); *see also Hurst v. Cook*, 981 So.2d 1143, 1153 (Ala.Civ.App. 2007) (similar). In other words, the touchstone of SESH's abuse of process claim is and must be that the process was abused <u>after</u> the initiation of this proceeding, not that plaintiffs lacked colorable grounds to invoke that process in the first place. *See Hollander*, 19 So.3d at 194 ("it is what is done in the course of the negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort" of abuse of process) (citations omitted). Thus, plaintiffs' protestation that they had a valid basis for initiating suit against SESH is not particularly illuminating and has little bearing on the summary judgment inquiry here.

That said, plaintiffs' Rule 56 Motion also challenges SESH's ability to satisfy the element of an abuse of process claim requiring a wrongful use of the process after it was issued. Specifically, plaintiffs assert that "there is no evidence that other than normal discovery and development of the case[] has taken place" and that Mr. Odom has steadfastly "engaged in the regular legitimate function in relation to the causes of action stated in the Complaint" by seeking "to gain compensation for land now used by SESH not described in the easement." (Doc. 79, at 4.) In response, defendant points to the Odoms' failure to accept SESH's pre- and post-Complaint offers to execute an amended easement eliminating the ribbon of "no man's land" on their property. SESH reasons that "[p]laintiffs have repeatedly refused SESH's offers of a full redress in favor of maintaining this lawsuit, and in doing so, have not carried their lawsuit out to its authorized conclusion." (Doc. 87, at 10.) It is on that premise that defendant relies to show the "wrongful use of process" element of its abuse of process claim.

In previous Orders, the undersigned has been critical of the Odoms' categorical opposition to reformation of the contract to eradicate the "gap" of land between the SESH and Gateway easements and to return land to them that they claim was "taken" by SESH.[11] In light

---

[11] For example, in denying plaintiffs' request for interlocutory appeal, the Court indicated that "Plaintiffs' emphatic and continued opposition to this equitable remedy – despite its obvious advantage to them – reasonably calls into question their motivation in pursuing this action." (Doc. 73, at 2 n.1.) Likewise, in the December 9 Order, the undersigned wrote, "Defendant's claim for reformation would return to the Odoms the unusable strip of land about

of Mr. Odom's incendiary and hostile statements to SESH representatives, as well as plaintiffs' spurning of proffered solutions that would alleviate the complained-of harm, the record supports a reasonable inference that the Odoms' conduct is prompted by ill will, spite, and a desire to inflict harm on SESH to punish it for placing a pipeline on their property. But nefarious purposes and malevolent intentions, without more, are insufficient to establish the tort of abuse of process under Alabama law; rather, this claim requires evidence that the defendant "somehow acted outside the boundaries of legitimate procedure after the charge had been filed." *Willis*, 814 So.2d at 866 (focus of abuse of process inquiry is not on whether defendant is acting out of spite or ill will, but whether defendant employed the process for "achievement of a benefit totally extraneous to or of a result not within its legitimate scope") (citations omitted); *see generally Wilcon, Inc. v. Travelers Indem. Co.*, 654 F.2d 976, 984 (5th Cir. 1981) ("Regardless of the defendant's motivation and no matter how malicious his intent, the plaintiff must still show that the defendant did not use the process at issue primarily to effectuate the remedy contemplated by the statute.").

        The critical legal question, then, is whether the Odoms have perverted legal process "to obtain a result which the process was not intended by law to effect" and which "is unlawful or improperly attainable under the law." *Hollander*, 19 So.3d at 193; *Moon*, 2 So.3d at 847. Viewing the record in the light most favorable to SESH, the Court answers this question in the negative. The Odoms asserted claims against SESH for damages based on a wedge of land that they claimed SESH had misappropriated through fraudulent and otherwise improper means. It is, of course, a regular and legitimate function of a civil lawsuit for a plaintiff to seek monetary recovery for a defendant's tortious conduct, even if the plaintiff is motivated by spite and ill will. That regular and legitimate function was not transformed or perverted into something unlawful, unauthorized or illegitimate simply because the Odoms rebuffed SESH's settlement offers to return the wedge of land to them. Throughout this litigation, plaintiffs have consistently manifested a desire to use the process to obtain damages for SESH's alleged tortious conversion

---

which they so bitterly complain, yet they are opposing it. ... Why? The Court is hard-pressed to understand how there could be any good-faith, legitimate basis for plaintiffs' stance." (Doc. 62, at 15 n.16.)

of the Odoms' land. It is not an act "outside the boundaries of legitimate procedure," *Willis*, 814 So.2d at 865, for a plaintiff to seek money damages stemming from an inaccurate easement agreement, rather than amendment of that contract to harmonize it with the parties' intent. In short, it is a regular and legitimate function for a tort cause of action to be brought seeking monetary relief. Without judicial reformation of the easement, an award of money damages would certainly be an authorized conclusion of the process, and one which the process was intended by law to effect. Therefore, as a matter of Alabama law, the Odoms' post-issuance-of-process conduct about which SESH complains simply does not rise to the level of wrongful use of process.

In light of the foregoing, and given the narrow construction afforded to and the disfavored status of abuse of process causes of action, the Court finds that SESH's abuse of process claim is not cognizable, as a matter of law. The facts in the light most favorable to SESH show nothing more than malicious intent, spitefulness or irrationality by the Odoms, without perversion of the process to obtain a result which it was not intended by law to effect.[12] Stated differently, the uncontested evidence is that the Odoms pursued the causes of action set forth in the Complaint to recover valid, potentially available tort damages, rather than for a collateral or extraneous purpose such as extortion. *Cf. Haynes*, 2009 WL 962523, at *5; *Hollander*, 19 So.3d at 194. This is not a wrongful use of process, no matter how malicious or mean-spirited the Odoms' intentions might have been. Accordingly, the Odoms' Motion for Summary Judgment (doc. 77) will be **granted** as to this cause of action.[13]

---

[12] In that regard, this case may be distinguished from the types of circumstances in which Alabama courts have deemed abuse of process claims to be viable, such as garnishing exempt wages to coerce the debtor to pay the entire debt, or causing an arrest for the purpose of pressuring the arrestee to surrender property to which the other is not entitled. *See supra*, at 7-8. The circumstances of coercion, extortion, and perversion of the process are present in all of these examples, but are conspicuously absent in the case at bar. The Odoms have not manipulated the process to obtain an unauthorized benefit totally extraneous to its legitimate scope, but instead have merely acted in conformity with a preference for one authorized result (monetary compensation for SESH's alleged tortious behavior) over another (equitable elimination of the "no man's land" strip of land created by SESH).

[13] To find otherwise would be to extend the Alabama tort of abuse of process to embrace any situation in which an angry, emotional litigant rejects a fair and reasonable

**III.     Summary Judgment Motion as to Fraud Claim concerning Restoration.**

The sole remaining cause of action is the Odoms' fraud claim relating to SESH's failure to restore their property.  As framed by plaintiffs in the Joint Pretrial Document (doc. 72), the gravamen of this claim is that "SESH, either intentionally, by mistake or recklessly misrepresented to the Odoms during the course of negotiating the acquisition of the Grant of Easement, that upon conclusion of the easement, their land would be restored to its preexisting condition and [that] the Odoms justifiably relied on those representations in signing the Grant or [*sic*] Easement."  (Doc. 72, at 3-4.)[14]  Plaintiffs contend that SESH's fraudulent representations induced them to execute the easement instrument and caused them damages when SESH failed to perform.  SESH now seeks summary judgment on that claim for several reasons, including

---

settlement offer in favor of moving forward with litigation.  There is no reason to believe that the Alabama Supreme Court would adopt such a dramatic, wholesale enlargement of this historically narrowly circumscribed cause of action.

[14]     SESH has suggested that this cause of action was never pleaded in the Complaint, but was simply conjured from thin air by the Court in the December 9 Order.  (Doc. 72, at 9; doc. 81, at 2-3.)  The undersigned does not agree.  As the December 9 Order explains, the fraud count in the Complaint included specific factual allegations that, contrary to the terms and conditions of the easement instrument, and "in addition to [other] representations made to the Plaintiffs," SESH "failed to restore the right-of-way to its condition prior to the commencement of its operations causing what was otherwise usable farmland to be unusable due to erosion and soil disturbance."  (Doc. 1, ¶ 9.)  Further, the Odoms had placed SESH on notice in discovery that they sought damages for the non-restoration of their property.  In response to interrogatories about the claimed damages, the Odoms stated that "[t]opsoil has been removed .... Rock and other debris was left.  The site is not level and collects water."  (Doc. 30, ¶ 3.)  In that same document, they demanded "any other applicable damages as to the cost of restoration of our property in terms of topsoil and alleviation of the drainage problems."  (*Id.*, ¶ 2.)  These interrogatory responses make sense only if the Odoms' fraud claim encompassed restoration issues.  Finally, in briefing on the initial summary judgment motion, the Odoms asserted that there were "material issues of fact that as a result of the construction in terms of the Grant of Easement restoration of their land has not been complied with ...."  (Doc. 43, at 7.)  Viewing all of these materials collectively, it was reasonable and appropriate to conclude that a promissory fraud failure-to-restore claim was part and parcel of the fraud cause of action interposed in Count One of the Complaint.  To the extent that SESH suggests that it was caught off guard by the December 9 Order's recognition of a cause of action that it did not know was in play, any prejudice has been alleviated by the Court's affording SESH a second bite at the summary judgment apple to litigate Rule 56 issues targeted specifically at that cause of action.

most notably that there is a dearth of evidence of intent to deceive.

### A. Relevant Facts.

There is no question that the Grant of Easement set forth specific promises by SESH to restore the Odoms' property after installing the pipeline. In particular, that document included the following representations:

> "At the conclusion of construction and consistent with the requirements of the Federal Energy Regulatory Commission and other governmental agencies having jurisdiction, [SESH] will clean up the Right-of-Way in a workmanlike manner and restore the Right-of-Way as nearly as practicable to the same condition as prior to commencement of its operations. Separated topsoil from initial grading would be spread uniformly across the ROW and excess rock would be removed from at least the top 12 inches of soil. The topsoil and subsoil would be tested for compaction at regular intervals and any severely compacted areas would be plowed with a paraplow or other deep-tillage device. In areas where he [*sic*] topsoil was segregated, the subsoil would be plowed before replacing the segregated topsoil."

(Doc. 85, Exh. 3, at 2-3.) Plaintiffs' position is that they relied on SESH's representations as a material inducement to their execution of the easement instrument, but that SESH never intended to perform these restoration promises.

The record contains substantial evidence of steps that SESH took to restore the property. For example, A. Glen Morrow, a contractor on the SESH pipeline project, avers that part of his job "was to make sure that required restoration activities were conducted on all property, including the Odom property." (Doc. 82, Att. 1, ¶ 3.) In the course of performing these duties, Morrow "personally participated in several random drive-by inspections of the Odom property during 2009 to check on the status of restoration," at which time he "observed no drainage or other restoration work remaining to be done." (*Id.*, ¶ 3.)[15] Morrow also indicates that if the Odoms had identified a need for additional restoration work, SESH's policy would have been to examine the property and perform any such additional work that may have been necessary. (*Id.*, ¶ 5.)

---

[15] In that regard, Morrow submits several site photographs date-stamped as having been taken on November 10, 2008 and July 15, 2009, all of which appear to show the Odoms' property in fully restored condition with the pipeline trench fully and appropriately filled and graded, and with vegetation growing in that location. (Doc. 85, Att. 1, ¶ 3 & Exh. A.)

In conjunction with the Morrow Affidavit, SESH submits a report (the "FERC Report") prepared by the Federal Energy Regulatory Commission ("FERC") describing its monitoring of restoration activities at the Odom site. (Doc. 82, Att. 1, ¶ 4.)[16] The FERC Report, which was dated September 19, 2008, reflected that the Odoms had complained about restoration issues in late August 2008, as a result of which a FERC monitor, Tallulah West, met with the Odoms. During her site visit, West witnessed SESH crews delivering a load of dirt, with grading equipment leaving the site as she arrived. (Doc. 82, Att. 1, Exh. B, at 1.) Mr. Odom conceded to West that SESH had been performing restoration activities on the property, including "that the field had been chisel plowed and that the construction debris and rocks had been collected." (*Id.*) Mr. Odom indicated that "he was satisfied with these efforts." (*Id.*) Mr. Odom's comments were reinforced by the FERC monitor's personal observations that "construction debris, woody debris and rocks had been removed" from the tract. (*Id.*) Nonetheless, Mr. Odom complained to West that water was ponding near the road crossing, a phenomenon which she personally observed; however, she also saw that "[a] pile of topsoil was dropped off in the ponded area," presumably for the purpose of addressing this problem. (*Id.*) West further reported that "[s]eeded vegetation in this area appeared to have been successfully established." (*Id.*) During her site visit, West also examined the Odoms' other affected tract, as to which she observed the following: (a) a patch of uneven ground where heavy equipment had accessed a stream; (b) strawbales, slope breakers and silt fencing installed on the property that appeared to be working adequately; (c) acceptable removal of construction debris, woody debris and rocks from the site, save for one specific problem location; and (d) successful establishment of seeded vegetation. (*Id.* at 3.)

The FERC monitor reported her outstanding concerns to a SESH representative, who indicated that most of these issues "should be easily remedied" and completed in short order.

---

[16] In addition to its contractual restoration commitment to the Odoms, SESH was subject to FERC oversight to ensure that the right-of-way property used for the pipeline was properly restored. Indeed, the record reflects that "FERC requires that a pipeline company restore all easement property, and the FERC monitors these efforts after construction is complete." (Doc. 82, Att. 3, at ¶ 6.) Thus, irrespective of what SESH promised to the Odoms, SESH was operating under FERC requirements mandating restoration of the Odoms' land, in any event. (*Id.*)

(*Id.* at 6.) SESH's undisputed evidence is that it corrected all restoration issues identified by the FERC monitor via additional site work performed in early to mid November 2008. (Doc. 82, Att. 1, ¶ 4.)

As further evidence of site restoration activities, SESH shows that it took prompt action to remedy specific clean-up problems brought to its attention. For example, when the Odoms complained about rocks left behind, a SESH crew of eight workers engaged in a methodical process to collect and remove those rocks from the site. (Vires Dep., at 21.) Similarly, upon receiving a complaint that there was a three-foot hole in the ground on or near the right-of-way at the Odoms' property, SESH promptly arranged to have the hole filled in, and verified a day or two later that it had been done. (*Id.* at 32-33.)

Notwithstanding the foregoing, the record in the light most favorable to the Odoms reflects that SESH did not complete the site restoration to their satisfaction. In discovery responses, the Odoms catalogue a variety of perceived or actual deficiencies in the restoration process, including the following: (a) SESH removed topsoil across the Odoms' property; (b) "built berms on the slope of the hillside ... have not been restored"; (c) "[d]ebris, muck and other construction materials were scattered over the area in which the pipeline was installed and have not been removed"; (d) "erosion on the northwest end of the pipeline construction ... has not been restored"; and (e) when it rains, there are "low points" where water collects, "which water did not stand there before construction." (Doc. 30, at ¶ 2.) The Odoms make no showing that they brought these particular concerns to SESH's attention during the restoration process, nor do they establish that SESH failed to undertake to correct any such defects of which the Odoms notified them.

### B.    *Analysis.*

Of the two grounds for summary judgment proffered by defendant on the promissory fraud claim concerning restoration, only one warrants discussion.[17] Specifically, SESH asserts

---

[17]    As its initial basis for seeking summary judgment, defendant contends that "there is no evidence demonstrating that SESH failed to comply with their restoration obligations." (Doc. 81, at 12.) In so arguing, SESH overlooks the Odoms' responses to interrogatories 2 and 3, even though defendant appended those responses to its Motion for Summary Judgment as Attachment 7. Plaintiffs' responses outline in substantial detail the respects in which they

that it is entitled to entry of summary judgment because the Odoms cannot meet their burden of establishing that, at the time of the alleged misrepresentation, SESH intended not to perform and intended to deceive the Odoms.

Alabama law is quite clear that when a plaintiff brings a fraud claim based on a defendant's promise to perform in the future, the elements that must be proven include "(1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive." *Valley Properties, Inc. v. Strahan*, 565 So.2d 571, 579 (Ala. 1990); *see also James v. City of Russellville*, --- So.3d ----, 2010 WL 58285, *2 (Ala.Civ.App. Jan. 8, 2010) (similar); *Byrd v. Lamar*, 846 So.2d 334, 343 (Ala. 2002) ("A plaintiff claiming promissory fraud must ... prove that at the time of the misrepresentation, the defendant intended not to perform the act promised and intended to deceive the plaintiff."). "The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive." *Southland Bank v. A & A Drywall Supply Co.*, 21 So.3d 1196, 1212 (Ala. 2008) (citations omitted); *see generally Byrd*, 846 So.2d at 343 ("Fraud is never presumed, and a person who asserts fraud has the burden of proof.") (citation omitted). "[M]isrepresentations made recklessly or innocently will not sustain an action for promissory fraud." *Southland*, 21 So.3d at 1212.

Faced with this daunting burden, the Odoms urge that the "proof is in the pudding" and that "[w]hether SESH intended to perform is a byproduct of what it did and what it said." (Doc. 86, at 3.) To the extent that plaintiffs are suggesting that proof of intent to deceive may be inferred from SESH's alleged non-performance of its restoration obligations, Alabama law refutes that proposition. "The plaintiff cannot meet his burden merely by showing that the

---

believe SESH failed to live up to its promises to restore their property (*i.e.*, removed topsoil, berms not restored, debris and muck never removed, low points that collect standing water, etc.). To accept SESH's argument that "[t]he undisputed facts establish that SESH restored Plaintiffs' property in accordance with the Easement Agreement" (doc. 81, at 13), the Court would have to wave off plaintiffs' interrogatory responses, elevating defense witnesses above plaintiffs. Such weighing of credibility is of course improper at this juncture, as the Odoms are entitled to have the record facts construed in the light most favorable to them for purposes of SESH's summary judgment motion. As such, defendant's assertion that it is undisputed that SESH fully and completely restored the Odoms' property after installing the pipeline is a non-starter for Rule 56 purposes.

alleged promise ultimately was not kept; otherwise any breach of contract would constitute a fraud. ... There must be substantial evidence of a fraudulent intent that existed when the promise was made." *Southland*, 21 So.3d at 1212 (citations omitted) (trial court erred in submitting promissory fraud claim to jury where evidence revealed no prior instances of unfulfilled promises and no actions post-promise that reflect an intent to deceive, and where defendant actually attempted to have loan approved as he had promised to do). Clearly, then, "mere failure to perform the promised act is not by itself sufficient evidence of fraudulent intent." *S.B. v. Saint James School*, 959 So.2d 72, 101 (Ala. 2006) (citations omitted) (summary judgment properly entered for defendant on promissory fraud claim where only evidence that defendant did not intend to delete photographs as promised was fact of non-deletion).

That said, the finder of fact may consider the defendant's failure to perform, "together with other circumstances, in determining whether, at the time the promise was made, the promisor intended to deceive." *S.B.*, 959 So.2d at 101 (citations omitted). Thus, "[a] defendant's intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made." *Byrd*, 846 So.2d at 343 (circumstantial evidence that defendant made promises about a music media program and knew at the time that those promises could not be fulfilled because the program did not exist are sufficient to create a jury question as to promissory fraud). This approach is unavailing for the Odoms because the circumstantial evidence, viewed in the light most favorable to them, does not give rise to a jury question as to whether SESH intended to deceive the Odoms when it promised to restore their property after installing the pipeline. There is no evidence of prior unfulfilled promises or post-promise actions indicative of an intent to deceive.[18] Moreover, given the uncontroverted evidence that FERC independently required SESH to restore rights-of-way utilized in the pipeline project, and that FERC monitored and enforced that restoration requirement, SESH could have had no possible motive to lie to the Odoms about its intent to

---

[18] Plaintiffs suggest that the appropriate circumstantial evidence includes facts as to "what SESH's capabilities were with all of its manpower, materials, consultants and otherwise." (Doc. 86, at 3.) However, the summary judgment record is devoid of such evidence, and this Court will not engage in speculation as to what SESH's "manpower, materials, consultants and otherwise" might be in order to formulate an unvarnished guess about SESH's "capabilities."

restore their property.  The language of the promise obligated SESH to do nothing more than was "consistent with the requirements of" FERC, such that SESH was merely promising the Odoms that it would do what FERC required of it.  Any failure to restore would have exposed SESH to regulatory scrutiny and, if necessary, compulsion.  In any event, there is no evidence, direct or circumstantial, that SESH intended to thumb its nose at federal regulators as to the restoration process, much less that it actually did so.

More fundamentally, plaintiffs have failed to meet their burden of proof because the unambiguous record evidence shows that SESH substantially endeavored to fulfill its restoration promise to the Odoms.  There is unrebutted evidence that SESH, among other things, dispatched a crew of laborers to remove rocks and debris from the Odom property, that it chisel plowed the field, that it sent grading equipment and loads of dirt to the Odom property as part of the restoration process, that it filled in a hole near the right-of-way after the Odoms brought it to their attention, that it successfully re-established seeded vegetation in the area, and that it consulted with the Odoms and the FERC monitor to identify and address specific restoration concerns.  Plaintiffs do not controvert defense evidence that SESH performed multiple inspections of the Odoms' property to check on the status of restoration, that a FERC monitor personally observed many of the positive steps taken by SESH in restoring the Odoms' property, and that Mr. Odom admitted being satisfied with certain restoration activities.  All of this evidence is inconsistent and irreconcilable with plaintiffs' insistence that SESH was trying to trick them when it promised to restore their property, and that it never intended to perform restoration services.  This is not a case in which the pipeline company vanished in the middle of the night after completing the installation process, never to be seen or heard from again.  To the contrary, it is beyond cavil that SESH had a substantial ongoing presence at the Odom property after installation was completed as it performed numerous restoration activities.  In light of this evidence, no reasonable finder of fact could conclude that SESH never intended to restore the Odoms' property when it represented to them that it would do so.[19]  Accordingly, plaintiffs have

---

[19] To avoid confusion on this point, it bears emphasis that the Court is not suggesting, much less finding, that SESH fully performed its restoration obligations under the Grant of Easement.  To the contrary, the undersigned acknowledges (and credits for summary judgment purposes) the Odoms' evidence that SESH's restoration work was deficient in certain

failed to present sufficient evidence of the intent element of promissory fraud to create a genuine issue of material fact, and judgment is properly entered against them on that cause of action.

## IV. Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1. Plaintiffs' Motion for Summary Judgment as to Abuse of Process Counterclaim (doc. 77) is **granted**, and the abuse of process cause of action found at Count Three of the Counterclaim is **dismissed with prejudice**.

2. Defendant's Motion for Partial Summary Judgment (doc. 80) is **granted**, and the promissory fraud claim brought by plaintiffs pertaining to defendant's restoration representations is **dismissed with prejudice**.

3. Because defendant's Motion for Partial Summary Judgment has been granted, and the promissory fraud claim has been dismissed, defendant's Motion to Dismiss Plaintiffs' Remaining Claim as Sanction (doc. 67) is **moot**.

4. There being no remaining triable issues, the Clerk of Court is directed to close this file for statistical and administrative purposes.

5. A separate final judgment will enter.

DONE and ORDERED this 29th day of April, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

respects. The point is not that SESH did everything it was supposed to do under the contract, but is rather that SESH undeniably engaged in substantial restoration activities on the Odoms' property. That conduct cannot be squared with the Odoms' promissory fraud claim that SESH intended to deceive them when it promised to restore their property. After all, SESH <u>did</u> perform restoration services, even if they were not completed to the extent or degree that the Odoms desired. This circumstantial evidence (which plaintiffs urge the Court to examine because, according to them, intent "is established by what one does, not by what one says he meant to do" (doc. 86, at 2)) deals a crippling blow to plaintiffs' promissory fraud cause of action, particularly where they fail to submit countervailing evidence that might support an inference of intent to deceive.